CAHILL GORDON & REINDEL LLP
JOEL KURTZBERG (*pro hac vice pending*, SBN NY 1758184)
FLOYD ABRAMS (*pro hac vice pending*, SBN NY 2835007)
JASON ROZBRUCH (*pro hac vice pending*, SBN NY 5753637)
32 Old Slip
New York, New York 10005
Phone: 212-701-3120
Facsimile: 212-269-5420
jkurtzberg@cahill.com

DOWNEY BRAND LLP
WILLIAM R. WARNE (SBN 141280)
MEGHAN M. BAKER (SBN 243765)
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Phone: 916-444-1000
Facsimile: 916-520-5910

*Attorneys for Plaintiff X Corp.*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| X CORP., | Case No. |
|        Plaintiff, | |
|    v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| ROBERT A. BONTA, Attorney General of California, in his official capacity, and SHIRLEY N. WEBER, Secretary of State of California, in her official capacity, | |
|        Defendants. | |

Plaintiff X Corp., by and through its attorneys, Cahill Gordon & Reindel LLP and Downey Brand LLP, alleges for its complaint against the above-named Defendants, as follows:

COMPLAINT

**NATURE OF THE ACTION**

1.   Plaintiff X Corp. brings this action challenging the constitutionality and legal validity of California Assembly Bill No. 2655 ("AB 2655"), which is codified in law at Cal. Elec. Code §§ 20510-20520.

2.   AB 2655 requires large online platforms like X, the platform owned by X Corp. (collectively, the "covered platforms"), to remove and alter (with a label) — and to create a reporting mechanism to facilitate the removal and alteration of — certain content about candidates for elective office, elections officials, and elected officials, of which the State of California disapproves and deems to be "materially deceptive."  It has the effect of impermissibly replacing the judgments of covered platforms about what content belongs on their platforms with the judgments of the State.  And it imposes liability on the covered platforms to the extent that their judgments about content moderation are inconsistent with those imposed by the State.  AB 2655 thus violates the First and Fourteenth Amendments of the United States Constitution; the free speech protections of Article I, Section 2, of the California Constitution; and the immunity provided to "interactive computer services" under Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c).

3.   Worse yet, AB 2655 creates an enforcement system that incentivizes covered platforms to err on the side of removing

and/or labeling any content that presents even a close call as to whether it is "materially deceptive" and otherwise meets the statute's requirements.  This system will inevitably result in the censorship of wide swaths of valuable political speech and commentary and will limit the type of "uninhibited, robust, and wide-open" "debate on public issues" that core First Amendment protections are designed to ensure. *New York Times* v. *Sullivan*, 376 U.S. 254, 270 (1964).  As the United States Supreme Court has recognized, our strong First Amendment protections for such speech are based on our nation's "profound national commitment" to protecting such debate, even if it often "include[s] vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.*

4.   AB 2655's problematic enforcement system provides expedited causes of action for injunctive and other equitable relief to the California Attorney General, every California district attorney, every California city attorney, and to candidates for elective office, elections officials, and elected officials, to force covered platforms to remove certain "materially deceptive content," alter that content, and comply with the statute's reporting requirement.  Even if the covered platform has a robust process for investigating reported content, it will be subject to such lawsuits for injunctive relief if it does not remove or label the reported content within 72 hours.  Enforcement

1 actions may be brought for "injunctive or other equitable relief
2 against any large online platform" to remove or label content that
3 should have been removed or labeled under the statute. *See*
4 §§ 20515(b), 20516.  In short, covered platforms may be sued if
5 governmental officials or candidates think they have not censored
6 or labeled enough content; but the platforms may not be sued by
7 anyone if they have arguably censored or labeled too much content
8 under the statute.  The result is a system that highly incentivizes
9 covered platforms to remove or label any content that presents a
10 close call to avoid lawsuits altogether.

11     5.  AB 2655 suffers from a compendium of serious First
12 Amendment infirmities.  Primary among them is that AB 2655 imposes
13 a system of prior restraint on speech, which is the "most serious
14 and the least tolerable infringement on First Amendment rights."
15 *Nebraska Press Ass'n* v. *Stuart*, 427 U.S. 539, 559 (1976).  The
16 statute mandates the creation of a system designed to allow for
17 expedited "take downs" of speech that the State has targeted for
18 removal from covered platforms in advance of publication.  The
19 government is involved in every step of that system: it dictates
20 the rules for reporting, defining, and identifying the speech
21 targeted for removal; it authorizes state officials (including
22 Defendants here) to bring actions seeking removal; and, through
23 the courts, it makes the ultimate determination of what speech is
24 permissible.  Rather than allow covered platforms to make their

own decisions about moderation of the content at issue here, it authorizes the government to substitute its judgment for those of the platforms.

6.   It is difficult to imagine a statute more in conflict with core First Amendment principles.  As the United States Supreme Court has held, "it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas." *Hustler Magazine, Inc.* v. *Falwell*, 485 U.S. 46, 56 (1988).  Even worse, AB 2655's system of prior restraint censors speech about "public issues and debate on the qualifications of candidates," to which the "First Amendment affords the ***broadest protection***" to ensure the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *McIntyre* v. *Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995).[1]

7.   AB 2655 imposes a prior restraint on speech because it provides, pursuant to Sections 20515(b) and 20516, expedited causes of action under Section 35 of the California Code of Civil Procedure through which political speech can be enjoined before there occurs a "final judicial determination" that the "speech is unprotected." *Isaksen* v. *Mazu Publ'g Co.*, 2005 WL 8176605, at *3 (E.D. Cal. Mar. 29, 2005) (citing *Vance* v. *Universal Amusement Co.*, 445 U.S. 308 (1980)) (denying motion for preliminary injunction as to already

---

[1] Unless otherwise indicated, emphases in quotes are added and internal citations and quotations are omitted.

published speech because it would have constituted a prior restraint). Although the statute tasks plaintiffs with demonstrating "through clear and convincing evidence" — *see* §§ 20515(b), 20516 — that the speech is "materially deceptive" content that otherwise meets the statute's requirements, that showing *does not* amount to proof that the speech is constitutionally unprotected. *See Kohls* v. *Bonta*, 2024 WL 4374134, at *3-5 (E.D. Cal. Oct. 2, 2024) (holding that a companion statute, AB 2839, that provides a cause of action against individuals who post "materially deceptive content" — defined nearly identically as it is in AB 2655 — likely violated the First Amendment on its face because the statute's "legitimate sweep pales in comparison to the substantial number of its applications . . . which are plainly unconstitutional"); *see also Garcia* v. *Google, Inc.*, 786 F.3d 733, 747 (9th Cir. 2015) (forcing Google through "takedown order" to remove content previously published on YouTube prior to a final determination that the content was unprotected amounted to a "classic prior restraint on speech"); *Living Vehicle, Inc.* v. *Kelley*, 2023 WL 2347442, at *9 (C.D. Cal. Jan. 20, 2023) (citing *Alexander* v. *United States*, 509 U.S. 544, 550 (1993); *Garcia*, 786 F.3d at 746-47) (prior restraints "refer either to injunctions that restrict future speech or require takedowns of currently-published speech"); *SolarPark Korea Co.* v. *Solaria Corp.*,

1   2023 WL 4983159, at *11 (N.D. Cal. Aug. 2, 2023) (same), *appeal*

2   *dismissed*, 2023 WL 9860831 (9th Cir. Sept. 28, 2023).

3      8.   Further evidencing that AB 2655 imposes a prior restraint

4   on speech is that, apart from the expedited suits for injunctive

5   and other relief authorized under Sections 20515(b) and 20516, (i)

6   nothing in AB 2655 prevents the enjoinment of speech through a

7   temporary restraining order or preliminary injunction alternative

8   to or in addition to such suits; (ii) AB 2655 mandates the immediate

9   removal of speech, without a determination that it is unprotected,

10  so long as it is "substantially similar" to speech "previously

11  removed" under the statute, § 20513(c); and (iii) the statute acts

12  as an overarching prior restraint by, in its pursuit of eliminating

13  certain speech altogether, imposing a system of censorship that

14  requires covered platforms that wish to avoid being sued to block

15  speech within 72 hours absent a final ruling that the speech is

16  unprotected.

17     9.   Even if AB 2655 were not a prior restraint, it still

18  violates the First Amendment because it runs counter to the United

19  States Supreme Court's recent decision in *Moody* v. *NetChoice, LLC*,

20  in which the Court held, in no uncertain terms, that when a social

21  media platform "present[s] a curated and 'edited compilation of

22  [third party] speech,'" that presentation "is itself protected

23  speech."  144 S. Ct. 2383, 2409 (2024) (quoting *Hurley* v. *Irish-*

24  *Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 570

COMPLAINT                        7

1   (1995)); *see also id.* at 2401 ("A private party's collection of

2   third-party content into a single speech product (the operators'

3   'repertoire' of programming) is itself expressive, and intrusion

4   into that activity must be specially justified under the First

5   Amendment."); *id.* at 2405 (quoting *Miami Herald Pub. Co.* v.

6   *Tornillo*, 418 U.S. 241, 258 (1974)) ("'The choice of material,'

7   the 'decisions made [as to] content,' the 'treatment of public

8   issues' — 'whether fair or unfair' — all these 'constitute the

9   exercise of editorial control and judgment.' . . . ***For a paper,***

10  ***and for a platform too.***"). Because AB 2655 impermissibly replaces

11  the judgments of the covered platforms about what speech may be

12  permitted on their platforms with those of the government, it

13  cannot be reconciled with the Supreme Court's decision in *Moody*.

14      10.  AB 2655 disregards numerous significant First Amendment

15  holdings by the Supreme Court in *Moody* — specifically, that (i) it

16  is not a "valid, let alone substantial" interest for a state to

17  seek "to correct the mix of speech" that "social-media platforms

18  present," *id.* at 2407; (ii) a "State 'cannot advance some points

19  of view by burdening the expression of others,'" *id.* at 2409

20  (quoting *Pac. Gas & Elec. Co.* v. *Pub. Utilities Comm'n of*

21  *California*, 475 U.S. 1, 20 (1986)); (iii) the "government may not,

22  in supposed pursuit of better expressive balance, alter a private

23  speaker's own editorial choices about the mix of speech it wants

24  to convey," *id.* at 2403; (iv) "it is no job for government to

decide what counts as the right balance of private expression — to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences. That principle works for social-media platforms as it does for others," *id.* at 2394; and (v) "[h]owever imperfect the private marketplace of ideas," a "worse proposal" is "the government itself deciding when speech [is] imbalanced, and then coercing speakers to provide more of some views or less of others," *id.* at 2403.

11.  AB 2655 also runs counter to the First Amendment's staunch protection of core political speech.  By imposing unintelligible prohibitions on allowing a specific category of speech under threat of enormous liability if it is not labeled and/or removed to the government's satisfaction, AB 2655 "acts as a hammer instead of a scalpel," *Kohls*, 2024 WL 4374134, at *8, greatly incentivizing covered platforms to censor *all* content that could reasonably fall within the statute's purview to avoid substantial enforcement costs.  This, in turn, will severely chill important political speech — specifically, the use of exaggerated or unfavorable visual means to undermine and combat political opponents, which, as the Supreme Court has recognized, is ingrained in the historical fabric of U.S. political commentary and subject to the strongest of First Amendment protections.

12.  Whether it be "Walt McDougall's characterization" in 1884 "of Presidential candidate James G. Blaine's banquet with the

millionaires at Delmonico's as 'The Royal Feast of Belshazzar'" or contemporary imaginings of Donald Trump's arrest[2] or what a second term under President Biden would look like,[3] "graphic depictions and satirical cartoons have played a prominent role in public and political debate," and "it is clear that our political discourse would [be] considerably poorer without them." *Falwell*, 485 U.S. at 54-55.  Indeed, "YouTube videos, Facebook posts, and X tweets are the newspaper advertisements and political cartoons of today, and the First Amendment protects an individual's right to speak regardless of the new medium these critiques may take." *Kohls*, 2024 WL 4374134, at *5.  Contemporary commentators frequently use artificial intelligence to generate this type of valuable commentary. *Id.*

13.  There is a long history of the strongest of First Amendment protections for speech critical of government officials and candidates for public office that includes tolerance for potentially false speech made in the context of such criticisms. And there is a long history of skepticism of any governmental attempts to regulate such content, no matter how well-intentioned they may be.  As both the Supreme Court and Judge Learned Hand have

---

[2] Ex. 1 (Eliot Higgins (@EliotHiggins), X (Mar. 20, 2023, 5:22 PM), formerly available at https://x.com/EliotHiggins/status/1637927681734987777 (last visited Nov. 5, 2024)).

[3] Ex. 2 (GOP, *Beat Biden*, YouTube (Apr. 25, 2023), https://www.youtube.com/watch?v=kLMMxgtxQlY (last visited Nov. 14, 2024)); *see also* Ex. 3 (S. Comm. on Judiciary, Analysis of Bill No. AB 2655, 2023-2024 Reg. Sess. (Cal. June 28, 2024)) at 7, 9 (citing this video as an example of how "generative AI can spread misinformation regarding elections with ease").

noted, "[t]he First Amendment" "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues than through any kind of authoritative selection.   To many, this is, and always will be, folly; but we have staked upon it our all." *Sullivan*, 376 U.S. at 270 (quoting *United States* v. *Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (Hand, J.)).  AB 2655 runs counter to these principles by attempting to impose by "authoritative selection" the permissible content on covered platforms, rather than allowing the "multitude of tongues" engaging in political debate and commentary on those platforms to do so. *See also, e.g.*, *Beilenson* v. *Superior Ct.*, 44 Cal. App. 4th 944, 954 (1996) ("Hyperbole, distortion, invective, and tirades are as much a part of American politics as kissing babies and distributing bumper stickers and pot holders. Political mischief has been part of the American political scene since, at least, 1800. . . . 'Once an individual decides to enter the political wars, he subjects himself to this kind of treatment. . . . [D]eeply ingrained in our political history is a tradition of free-wheeling, irresponsible, bare knuckled, Pier 6, political brawls.'").

14.  Accordingly, AB 2655 violates the First Amendment of the United States Constitution and Article I, Section 2, of the California Constitution, both facially and as-applied to X Corp. AB 2655 imposes a prior restraint on speech that forces platforms to censor only certain election-related content of which the State

of California disapproves and also directly and impermissibly interferes with the constitutionally protected content-moderation speech rights of covered social media platforms, like X.  And AB 2655 does so notwithstanding that less speech-restrictive alternatives would serve California's interest in protecting its free and fair elections.

15.  AB 2655 also directly contravenes the immunity provided to the covered platforms by 47 U.S.C. §§ 230(c)(1) and 230(c)(2), which prohibit (i) treating interactive computer service providers as the "publisher or speaker of any information provided by another information content provider," § 230(c)(1); and (ii) liability "on account" of "any action" "taken to enable or make available to information content providers or others the technical means to restrict access to [objectionable] material," § 230(c)(2)(B).

16.  First, in violation of § 230(c)(1), by providing causes of action for "injunctive or other equitable relief against" the covered platform to remove or (by adding a label) to alter certain content posted on the platform by its users (see §§ 20515(b), 20516), AB 2655 treats covered platforms "as the publisher or speaker of information provided by another information content provider."  47 U.S.C. § 230(c)(1).

17.  Second, in violation of § 230(c)(2)(B)'s prohibition on holding platforms liable for "action[s] taken to enable or make available to information content providers or others the technical

means to restrict access to [objectionable] material," AB 2655 provides causes of action for "injunctive or other equitable relief against" covered platforms that attempt to comply with the statute's reporting requirement, but do so in a manner that, in the government attorney's view, does not meet the reporting "require[ments]" of "subdivision (a) of Section 20515." § 20516. In other words, a covered platform's attempt to comply with the statute's reporting requirement (i.e., by creating a reporting requirement for users to report content covered by the statute) *is* an action, as contemplated by § 230(c)(2)(B), to make available the technical means to restrict access to objectionable content, and, in contravention thereof, AB 2655 imposes liability on any covered platform that takes such action in a manner deemed insufficient by the California government.

18. So too does AB 2655 violate the First and Fourteenth Amendments of the United States Constitution for vagueness. AB 2655's requirements are so vague and unintelligible that covered platforms cannot understand how to comply with them; thus, those subject to its language will be compelled to over-censor speech to avoid costly litigation over countless judgment calls surrounding whether the statute prohibits particular pieces of content.

19. In pursuing this action, X Corp. seeks declaratory relief and preliminary and permanent injunctive relief on the grounds that AB 2655 (i) violates the free speech rights of X Corp. and the

other covered platforms under the First Amendment of the United States Constitution and Article I, Section 2, of the California Constitution, both facially and as-applied to X Corp.; (ii) directly conflicts with, and is thus preempted by, the immunity afforded to X Corp. by 47 U.S.C. §§ 230(c)(1) and 230(c)(2); and (iii) violates the First and Fourteenth Amendments of the United States Constitution because its requirements are so vague and unintelligible that the covered platforms cannot understand what they permit and what they prohibit, which will lead to blanket censorship, including of valuable political speech.

20.  In pursuing this action, X Corp. seeks to vindicate the deprivation of constitutional rights under color of state statute, ordinance, regulation, custom, and/or usage.  X Corp. is also entitled to attorneys' fees and costs if it prevails on any of its § 1983 claims.  *See* 42 U.S.C. § 1988.

**PARTIES**

21.  Plaintiff X Corp. is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Bastrop, Texas.  X Corp. provides the X service, which is a real-time, open, public conversation platform, where people can see every side of a topic, discover news, share their perspectives, and engage in discussion and debate.  X allows people to create, distribute, and discover content and has democratized content creation and distribution.  X allows users to create and

share ideas and information instantly through various product features, including public posts.

22.  AB 2655 applies to X Corp. because X is a "large online platform," as defined by the statute — i.e., a "public-facing internet website," "video sharing platform," and "social media platform as defined by Section 22675 of the Business and Professions Code"[4] that "had at least 1,000,000 California users during the preceding 12 months." § 20512(h).

23.  Defendant Robert Bonta is the Attorney General of the State of California and is charged with enforcing AB 2655. X Corp. sues Attorney General Bonta in his official capacity as the person charged with enforcing AB 2655.

24.  Defendant Shirley Weber is the Secretary of State of the State of California and is also charged with enforcing AB 2655.  X Corp. sues Secretary Weber in her official capacity as the person charged with enforcing AB 2655.

**JURISDICTION**

25.  This Court has jurisdiction over X Corp.'s federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) and 42 U.S.C.

---

[4] X is a "social media platform," as defined by Section 22675 of the Business and Professions Code, because it is a public internet-based service or application with users in California and (i) "[a] substantial function of the service or application is to connect users in order to interact socially with each other within the service or application" and (ii) it allows its users to (a) "construct a public or semipublic profile for purposes of signing into and using the service or application"; (b) "[p]opulate a list of other users with whom an individual shares a social connection within the system"; and (c) "[c]reate or post content viewable by other users, including but not limited to, on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users."

1 § 1983, because X Corp. alleges violations of its rights under the

2 Constitution and laws of the United States. The Court has

3 jurisdiction over X Corp.'s state claim pursuant to 28 U.S.C.

4 § 1367.

5    26. This Court has authority to grant declaratory and

6 injunctive relief under the Declaratory Judgment Act, 28 U.S.C.

7 §§ 2201, 2202, and under the Court's inherent equitable

8 jurisdiction.

9                              **VENUE**

10    27. Venue is proper in this Court under 28 U.S.C.

11 §§ 1391(b)(1) and 1391(b)(2) because the Defendants are located,

12 reside, and have offices in this judicial district and in the State

13 of California, and the violations of X Corp.'s rights are occurring

14 and will occur within this judicial district. AB 2655 was also

15 enacted in this judicial district.

16                      **FACTUAL ALLEGATIONS**

17 **I.   AB 2655's Statutory Scheme**

18    28. AB 2655, which applies to "large online platform[s],"

19 including "public-facing internet website[s]," "video sharing

20 platform[s]," and "social media platform[s] as defined in Section

21 22675 of the Business and Professions Code" that "had at least

22 1,000,000 California users during the preceding 12 months,"

23 §§ 20512(h), 20513–20516, has five main components.

24

29.   First, a requirement that covered platforms "develop and implement procedures for the use of state-of-the-art techniques to identify and remove certain materially deceptive content"[5] about "candidate[s] for elective office,"[6] "elections official[s],"[7] and "elected official[s]"[8] (the **Removal Requirement**).   *See* § 20513.

30.   Second, a requirement that covered platforms "develop and implement procedures for the use of state-of-the-art techniques to identify materially deceptive content and for labeling such content" meeting certain conditions (the **Labeling Requirement**). *See* § 20514.

---

[5] "Materially deceptive content" means "audio or visual media that is digitally created or modified, and that includes, but is not limited to, deepfakes and the output of chatbots, such that it would falsely appear to a reasonable person to be an authentic record of the content depicted in the media," but "does not include any audio or visual media that contains only minor modifications that do not significantly change the perceived contents or meaning of the content," including "changes to the brightness or contrast of images, removal of background noise in audio, and other minor changes that do not impact the content of the image or audio or visual media."  § 20512(i).

[6] While AB 2655 does not define "elective office," "[c]andidate" means any person running for President or Vice President of the United States, any person running for the office of Superintendent of Public Instruction, or any person running for a voter-nominated office as defined in Cal. Elec. Code § 359.5 (*see* § 20512(c)), which means a "congressional or state elective office for which a candidate may choose to have his or her party preference or lack of party preference indicated upon the ballot" and includes the Governor, Lieutenant Governor, Secretary of State, Controller, Treasurer, Attorney General, Insurance Commissioner, Member of the State Board of Equalization, United States Senator, Member of the United States House of Representatives, State Senator, and Member of the Assembly.

[7] "Elections official" means (i) the California Secretary of State or (ii) an elections official as defined by Cal. Elec. Code § 320 (§ 20512(g)), which is a (a) "clerk or any person who is charged with the duty of conducting an election," or (b) "county clerk, city clerk, registrar of voters, or elections supervisor having jurisdiction over elections within any county, city, or district within the state."

[8] AB 2655 does not define "elected official."

31.  Third, a requirement that covered platforms "provide an easily accessible way for California residents to report to that platform content that should be removed pursuant to Section 20513 or labeled pursuant to Section 20514" and "respond to the person who made the report within 36 hours" (the "**Reporting Requirement**"). *See* § 20515(a).

32.  Fourth, enforcement provisions, whereby candidates for elective office, elected officials, election officials, the California Attorney General, any California district attorney, and any California city attorney may seek, under certain conditions, "injunctive or other equitable relief against" the covered platform to force it to comply with the Removal Requirement (i.e., to remove particular content), the Labeling Requirement (i.e., to label particular content), or the Reporting Requirement (the "**Enforcement Provisions**").  *See* §§ 20515(b), 20516.

33.  Fifth, exemptions for certain entities, including broadcasting stations and online newspapers and magazines meeting certain conditions, and certain content, including materially deceptive content that constitutes "satire or parody" (which are terms that the statute does not define).  *See* §§ 20513(d), 20519.

**a. The Removal Requirement**

34.  AB 2655's Removal Requirement mandates that covered platforms develop and implement procedures that use state-of-the-

art techniques to identify and remove materially deceptive content
if *all* of the following conditions are met, **§ 20513(a):**

    a. The content is reported pursuant to Section 20515(a), **§ 20513(a)(1);**

    b. The materially deceptive content is *any* of the following:

        i. A candidate for elective office portrayed as doing or saying something that the candidate did not do or say and that is reasonably likely to harm the reputation or electoral prospects of a candidate, **§ 20513(a)(2)(A);**

        ii. An elections official portrayed as doing or saying something in connection with the performance of their elections-related duties that the elections official did not do or say and that is reasonably likely to falsely undermine confidence in the outcome of one or more election contests, **§ 20513(a)(2)(B);** or

        iii. An elected official portrayed as doing or saying something that influences an election in California that the elected official did not do or say and that is reasonably likely to falsely undermine confidence in the outcome of one or more election contests, **§ 20513(a)(2)(C);**

    c. The content is posted during the 120 days leading up to an election and through the election day, or — if the content depicts or pertains to elections officials — during the 120

COMPLAINT           19

leading up to an election, through the election day, and until the 60th day following the election, **§§ 20513(a)(3), 20513(e);** and

d. The covered platform knows or acts with reckless disregard for the fact that the content meets Section 20513's requirements, **§ 20513(a)(4).**

35.  If content "is determined" to meet Section 20513(a)'s requirements, the covered platform must remove the content "upon that determination, but no later than 72 hours after a report is made pursuant to" Section 20515(a).  **§ 20513(b).**

36.  Covered platforms must also identify, using state-of-the-art techniques, and remove, upon discovering or being alerted to the posting or reposting of, any "identical or substantially similar" materially deceptive content that the platform previously removed pursuant to AB 2655, provided that the removal occurs during the time period or periods set forth under Section 20513(e). **§ 20513(c).**

**b. The Labeling Requirement**

37.  AB 2655's Labeling Requirement mandates that covered platforms develop and implement procedures using state-of-the-art techniques to identify materially deceptive content and for labeling such content if *all* of the following conditions are met, **§ 20514(a):**

a. The content is reported pursuant to Section 20515(a), **§ 20514(a)(1);**

b. The materially deceptive content is either (i) encompassed by Section 20513(a) but is posted outside Section 20513(e)'s applicable time periods or (ii) appears within an advertisement or election communication[9] and is not subject to Section 20513, **§ 20514(a)(2);** and

c. The covered platform knows or acts with reckless disregard for the fact that the materially deceptive content meets Section 20514's requirements, **§ 20514(a)(3).**

38. If content "is determined" to meet Section 20514(a)'s requirements, the covered platform must label the content "upon that determination, but no later than 72 hours after a report is made pursuant to" Section 20515(a). **§ 20514(b).**

39. The label required by Section 20514(b) must state: "This [image, audio, or video (depending on the type of content at issue)] has been manipulated and is not authentic." **§ 20514(c).** The label must also permit users to "click or tap on it for additional

---

[9] "Election communication" means a general or public communication that is not an "advertisement" and that concerns (i) a candidate for elective office (ii) voting or refraining from voting in an election in California, (iii) the canvass of the vote for an election in California (meaning any election where a "candidate" is on the ballot or where a statewide initiative or statewide referendum measure is on the ballot), (iv) voting machines, ballots, voting sites, or other property or equipment related to an election in California, or (v) proceedings or processes of the electoral college in California. §§ 20512(e), 20512(f). "Advertisement" means any general or public communication that a large online platform knows is authorized or paid for with the purpose of supporting or opposing a candidate for elective office. § 20512(a).

explanation about the materially deceptive content in an easy-to-understand format." **§ 20514(d).**

40. The Labeling Requirement applies (i) during the period beginning six months before an election in California and through the day of the election; and (ii) if the content depicts or pertains to elections officials, the electoral college process, a voting machine, ballot, voting site, or other equipment related to an election, or the canvass of the vote, during the period beginning six months before an election in California, through the 60th day following the election. **§ 20514(e).**

### c. The Reporting Requirement

41. AB 2655's Reporting Requirement mandates that covered platforms provide an "easily accessible way" for California residents to report to the platform content that should be removed pursuant to Section 20513 or labeled pursuant to Section 20514. **§ 20515(a).**

42. The covered platform must respond to the person who made the report within 36 hours of the report, and the response must describe "any action taken or not taken" by the platform with respect to the reported content. *Id.*

### d. The Enforcement Provisions

43. AB 2655 provides various methods of enforcement against covered platforms that do not sufficiently comply with the statute's Removal, Labeling, and Reporting Requirements.

44.  First, AB 2655 authorizes candidates for elective office, elected officials, and elections officials to seek injunctive or other equitable relief against a covered platform if they make a report pursuant to Section 20515(a) and (i) do not receive a response within 36 hours, (ii) disagree with the platform's response or action taken, or (iii) if the platform does not act within 72 hours.  Upon *any* of those occurrences, AB 2655 authorizes candidates for elective office, elected officials, and elections officials to seek injunctive or other equitable relief against the covered platform to compel (a) the removal of specific content pursuant to Section 20513, (b) the labeling of specific content pursuant to Section 20514, or (c) compliance with the reporting process pursuant to Section 20515(a).  There is no action authorized that permits injunctive or equitable relief by any of these parties against covered platforms to compel the platforms to put content back online that was removed improperly or to take down a label of content that was improperly added.  **§ 20515(b)**.

45.  Second, AB 2655 authorizes the California Attorney General, any California district attorney, and any California city attorney to seek injunctive or other equitable relief against a covered platform to compel (i) the removal of specific content pursuant to Section 20513, (ii) the labeling of specific content pursuant to Section 20514, or (iii) compliance with the reporting process pursuant to Section 20515(a).  There is no action

authorized that permits injunctive or equitable relief by any of these parties against covered platforms to compel the platforms to put content back online that was removed improperly or to take down a label of content that was improperly added. **§ 20516.**

### e. Exemptions

46. AB 2655 exempts certain entities and content from its requirements.

47. First, AB 2655 does not apply to regularly published online newspapers, magazines, or other periodicals of general circulation that routinely carry news and commentary of general interest, even if they publish materially deceptive content that a covered platform would be required to remove or label, so long as the publication of the newspaper, magazine, or other periodical contains a "clear disclosure" that the materially deceptive content does not accurately represent any actual event, occurrence, appearance, speech, or expressive conduct. **§ 20519(a).**

48. Second, AB 2655 does not apply to broadcasting stations that broadcast prohibited materially deceptive content as part of a "bona fide newscast, news interview, news documentary, commentary of general interest, or on-the-spot coverage of bona fide news events," so long as the broadcast "clearly acknowledges," through content or a disclosure and in a manner that can be "easily heard or read by the average listener or viewer," that the materially deceptive content does not accurately represent any actual event,

occurrence, appearance, speech, or expressive conduct. **§ 20519(b)(1).**

49. Third, AB 2655 does not apply to broadcasting stations that are paid to broadcast materially deceptive content if (i) the broadcasting station can show that it has "prohibition and disclaimer requirements that are consistent" with those set forth in the statute and has provided those requirements to each person or entity that purchased the advertisement, or (ii) federal law requires that the broadcasting station air advertisements from legally qualified candidates or prohibits the broadcasting station from censoring or altering the message. **§ 20519(b)(2).**

50. Fourth, AB 2655 does not apply to materially deceptive content that constitutes "satire or parody." **§ 20519(c).**

51. Finally, AB 2655's Removal Requirement does not apply to a candidate for elective office who, during the time period set forth in Section 20513(e), "portrays themself" as doing or saying something that the candidate did not do or say, if the digital content includes a disclosure stating: "This [image, audio, or video (depending on the type of content at issue)] has been manipulated." **§ 20513(d).**

    a. For visual media, the text of the disclosure must be in a size that is "easily readable by the average viewer and no smaller than the largest font size of other text appearing in the visual media." If the visual media includes no other

text, the disclosure must be "in a size that is easily readable by the average viewer." For visual media that is video, the disclosure shall appear for the duration of the video. **§ 20513(d)(2)(A).**

b. If the media consists of audio only, the disclosure must be read in a "clearly spoken manner and in a pitch that can be easily heard by the average listener, at the beginning of the audio, at the end of the audio, and, if the audio is greater than two minutes in length, interspersed within the audio at intervals of not greater than two minutes each." **§ 20513(d)(2)(B).**

## II. AB 2655 Imposes Content-Based Restrictions on Protected Political Speech

52. The legislative history of AB 2655 is riddled with numerous references to the First Amendment problems raised by the statute. As the legislative history makes clear, by explicitly targeting derogatory political speech about candidates, AB 2655 imposes content-based speech restrictions that, under our Constitution and precedents, must be given the "broadest protection" to maintain a free-flowing marketplace of ideas for the "bringing about of political and social changes desired by the people." *See McIntyre*, 514 U.S. at 346. For instance:

53. The Assembly Committee on Judiciary's April 22, 2024 analysis acknowledges that

[AB 2655] would *interfere with both the expression and reception of information based upon its content*. Moreover, *not only does this bill single out particular content, the content relates to political candidates and elections*. This is potentially problematic because the First Amendment affords the *"broadest protection"* to the "discussion of public issues" and "political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." (*McIntyre v Ohio Election Commission* (1997) 514 U.S. 334.) It is difficult to imagine any content more related to "political expression" and "discussion of public issues" than content about candidates and elections. *The fact that the bill restricts speech that is "materially deceptive" or "false" does not matter*, for the U.S. Supreme Court has been unequivocal that the First Amendment protects even "false" speech. *The remedy for false speech is more true speech, and false speech tends to call forth true speech*. (*United States v Alvarez* (2012) 567 U.S. 709.)

Ex. 4 (Assemb. Standing Comm. on Judiciary, Analysis of Assemb. Bill No. 2655, 2023-2024 Reg. Sess. (Cal. Apr. 22, 2024)) at 7.

54. The Senate Judiciary Committee's June 28, 2024 analysis states that "*[l]aws that burden political speech are subject to strict scrutiny . . . California courts have been clear that political expression in the context of campaigns of any manner should be given wide latitude*[.]" Ex. 3 at 14 (citing *Citizens United* v. *Fed. Election Comm'n*, 558 U.S. 310, 340 (2010); *Beilenson* v. *Superior Ct.*, 44 Cal. App. 4th 944, 954-55 (1996)).

55. The Assembly Committee on Judiciary's April 22, 2024 analysis recognizes that "*[i]n reviewing the law, the Court would apply strict scrutiny*." Ex. 4 at 8.

56. California State Assembly member Rebecca Bauer-Kahan, who supported AB 2655, stated, "*I think we all agree that strict*

1    *scrutiny would be applied.*"   Ex. 5 (*Defending Democracy from*

2    *Deepfake Deception Act of 2024: Hearing on AB 2655 Before the*

3    *Assemb. Standing Comm. on Judiciary*, 2023-2024 Reg. Sess. (Cal.

4    Apr. 23, 2024)) at 6 (statements of Rebecca Bauer-Kahan, Assemb.

5    Member).[10]

6         57.   The American Civil Liberties Union, which opposed AB

7    2655, explained that the

8         "*novelty of deepfake technology and the speed with which
          it is improving*" *do not justify relaxing the stringent
9         protections afforded to political speech by the First
          Amendment.* The Supreme Court has held that "whatever the
10        challenges of applying the Constitution to ever advancing
          technology, '*the basic principles of freedom of speech
11        and the press, like the First Amendment's command, do
          not vary' when a new and different medium for
12        communication appears."* The law has long made clear that
          the First Amendment was intended to create a *wide berth
13        for political speech* because it is the core of our
          democracy.   The   First   Amendment   provides   robust
14        protection for speech of all kinds. Speech that is false,
          confusing,  or  which  presents  content  that  some  find
15        abhorrent,  nevertheless  maintains  its  constitutional
          protections as a driver of free discourse. This remains
16        so  no  matter  what  the  technology  used  to  speak.
          *Unfortunately, the provisions of AB 2655 as currently
17        drafted threaten to intrude on those rights and deter
          that vital speech.*

18   Ex. 3 at 18-19.

19

20

21

22   _____

[10]                              Available                        at
23   https://digitaldemocracy.calmatters.org/hearings/257837?t=255&f=afb99536b82e1a
     34379ebbfd23fe84b1  (4:37-4:40)  (last  visited  Nov.  14,  2024).   All  exhibit
24   transcripts,  which  were  downloaded  directly  from  the  websites,  are  auto-
     generated,  uncertified,  and  may  contain  errors.   To  that  end,  all  quotations
     herein are transcribed directly from the videos themselves.

III.  **AB 2655 Will Result in Censorship of Substantial Amounts of Valuable Political Speech**

58.  Whether content is prohibited under AB 2655 hinges on various undefined terms that render it impossible for covered platforms to comply with the statute in a precise manner.  Moreover, because the Enforcement Provisions provide for causes of action seeking to require the covered platforms to remove or label "materially deceptive content" covered by the statute, but do *not* provide for any consequences for improperly removing or labeling content that should not have been removed or labeled, the covered platforms are incentivized under the enforcement regime to err significantly on the side of censorship to avoid the substantial costs associated with defending lawsuits under the statute.  And, as AB 2655's legislative history makes clear, this will result in substantial censorship of content that lies at the heart of the protections provided by the First Amendment — including important commentary that invites vital discussion about election officials and candidates.

59.  The April 8, 2024 analysis of the Assembly Committee on Elections aptly describes the difficulties that covered platforms will encounter in attempting to comply with AB 2655:

> [I]n order to determine whether it must block content that *portrays a candidate for election as doing or saying something that the candidate did not do or say*,[11] the platform would need to know not only that the person portrayed in the content was a candidate for office, but

---

[11] Emphasis in original.

also the date (or dates) of the election when the candidate will appear on the ballot. Similarly, it would need to determine whether the candidate had actually said or done the thing that the candidate is portrayed as doing. While some of that information will be widely available and well known in some cases (e.g., the identity of major party candidates for President of the United States in presidential general elections and the dates of federal elections), it will be more arcane in other situations. Given the number of elections (including standalone local and special elections) and candidates (including write-in candidates and candidates for local elections in smaller jurisdictions) in California at any given time, **_making the determinations at scale about which content must be blocked or labeled likely will be considerably more challenging than making those determinations on a case-by-case basis in a court of law_**.

Ex. 6 (Assemb. Standing Comm. on Elections, Analysis of Assemb. Bill No. 2655, 2023–2024 Reg. Sess. (Cal. Apr. 8, 2024)) at 8.

60.  The statute's compressed timeframes for making these determinations — covered platforms must respond to requests to remove content pursuant to the statute "within 36 hours, describing any action taken or not taken" with respect to the content, § 20515(a), and take action to remove any such content "no later than 72 hours after a report is made," § 20513(b) — only exacerbate these problems.  If these timeframes are not met, an enforcement action may be filed against the covered platform.  _See_ §§ 20515(b), 20516.

61.  Tracy Rosenberg of Oakland Privacy, which opposed AB 2655, similarly recognized that "**_technology platform[s] can[not] be expected to know everything that every candidate running for office [has said] . . . So basically we're using imprecise measures_**

1 | ***to power a potentially broad censorship regime of blocking content.***
2 | ***And we really can't support that even under the guise of defending***
3 | ***democracy***."   Ex. 7 (*Defending Democracy from Deepfake Deception*
4 | *Act of 2024: Hearing on AB 2655 Before the Assemb. Standing Comm.*
5 | *on Elections*, 2023–2024 Reg. Sess. (Cal. Apr. 10, 2024)) at 6
6 | (statements of Tracy Rosenberg, Oakland Privacy).[12]   At a hearing
7 | in front of the Senate Committee on Judiciary, Rosenberg added that
8 | "***[t]his is not what people want***."   Ex. 8 (*Defending Democracy from*
9 | *Deepfake Deception Act of 2024: Hearing on AB 2655 Before the S.*
10 | *Standing Comm. on Judiciary*, 2023–2024 Reg. Sess. (Cal. July 2,
11 | 2024)) at 4 (statements of Tracy Rosenberg, Oakland Privacy).[13]

62.  Difficult questions about the applicability of the statute to any given political advertisement or video will be commonplace and will put covered platforms in a bind; they can either remove or label any content raising close calls (and avoid entirely the risk of liability) or subject themselves to a high likelihood of costly litigation.

63.  For instance, on April 25, 2023, the official Republican National Committee YouTube channel posted a video titled "Beat Biden" that, using artificial intelligence, imagined various scenarios that would occur during a second presidential term under

---

[12] Available at https://digitaldemocracy.calmatters.org/hearings/257736?t=1986&f=da025f00cb70d1ea6196340ca76df63e (33:23-34:12) (last visited Nov. 14, 2024).

[13] Available at https://digitaldemocracy.calmatters.org/hearings/258109?t=763&f=7421e586be4213e768ac887bce75f630 (12:54) (last visited Nov. 14, 2024).

Joe Biden, including that "international tensions [will] escalate," "financial systems [will] crumble," and "crime [will] worsen[]." Ex. 2.  As shown below in Figure 1, the video's description states that it is "[a]n AI-generated look into the country's possible future if Joe Biden is re-elected in 2024."

**FIGURE 1**



64.  Does this video portray President Biden "doing or saying something that" he "did not do or say," and would it have been "reasonably likely" that the video would have "harm[ed] [his] reputation or electoral prospects?"  Perhaps not, but this video was cited in AB 2655's legislative history as an example of how "generative AI can spread misinformation regarding elections with ease," *see* Ex. 3 at 7, 9, seemingly indicating that, at least some

1    of the drafters think it would be prohibited under the statute.

2    Given that the video asks "what if the weakest president we've ever

3    had were re-elected," would the video fall within Section

4    20519(c)'s exemption for satire or parody?  That is also unclear.

5    Adding to the confusion, moreover, is that the video's caption

6    clearly states that the video was "AI-generated," but this would

7    not bring the video within Section 20513(d)'s safe harbor because

8    it was posted by someone other than President Biden. *See* § 20513(d)

9    ("[T]his section does not apply to a candidate for elective office

10   who . . . ***portrays themself*** as doing or saying something that the

11   candidate did not do or say . . . ").  Faced with this lack of

12   clarity, and while having to make this type of determination at

13   mass-scale, covered platforms would have no choice but to remove

14   the video or potentially face enforcement actions brought by highly

15   motivated political opponents or government officials.

16       65. Another example further demonstrates AB 2655's

17   unintelligibility.  In March 2023, an X user named Eliot Higgins

18   (@EliotHiggins) used artificial intelligence to create a photo

19   depicting Donald Trump being forcefully arrested.  Ex. 1; *see*

20   Figure 2, below.  The same questions arise.  Do these photos portray

21   Donald Trump "doing or saying something that" he "did not do or

22   say," and would it be "reasonably likely" that the photos would

23   "harm [his] reputation or electoral prospects?"  Would these photos

24   be exempted as satire or parody under Section 20519(c)?  As long

as colorable arguments can be made that this type of political commentary is covered by the statute, covered platforms will be faced with the choice of removing and/or labeling such content (which would ensure no liability for them) or facing costly enforcement actions.

**FIGURE 2**



66.   To take another example, on August 29, 2024, the X user Kamala HQ (@KamalaHQ) posted a five-second video on X where Vice Presidential candidate JD Vance says, "Democrats want to attack Republicans as being anti-union and sometimes the shoe fits."[14] The clip cuts out right before Vance says "but not me, and not Donald

---

[14]   Ex. 9 (Kamala HQ (@KamalaHQ), X (Aug. 29, 2024, 12:57 PM), https://x.com/KamalaHQ/status/1829201653175636390 (last visited Nov. 14, 2024)).

Trump."[15]  How would the statute treat this edited snippet, which arguably misleadingly changes the **meaning** of what JD Vance actually said?  AB 2655 defines "materially deceptive content" as "audio or visual media that is digitally created **or modified** . . . such that it would falsely appear to a reasonable person to be an authentic record of the content depicted in the media."  § 20512(i)(1).  In the context of highly contested elections, candidates and government officials (such as Defendants) would be incentivized to issue take down requests for videos, like this one, that have even arguably been modified in ways that change their meaning and arguably give a misleading impression of what was actually said.  The results would be calamitous.  To avoid liability, covered platforms will be incentivized to remove and/or label such content pursuant to the statute.  If they fail to do so, they will likely face costly enforcement actions.

67.  Finally, AB 2655 purports to exempt "[m]aterially deceptive content that constitutes satire or parody," § 20519(c), but it does not define "satire or parody."  When faced with arguments about whether otherwise "materially deceptive content" encompassed by the statute is "satire" or "parody," AB 2655 incentivizes covered platforms to remove and/or label such content whenever there is a debate about that highly contentious subject.

---

[15] *See* the full video at Ex. 10 (The International Association of Fire Fighters, *57th IAFF Convention: Sen. JD Vance*, YouTube (Aug. 29, 2024), https://www.youtube.com/watch?v=EGKTo5j3gl0&t=1081s (last visited Nov. 14, 2024)).

This is because, under the Enforcement Provisions, removal and/or labeling of flagged content results in complete immunity for the covered platforms, while refusing to do so opens them up to potential costly litigation.

68.  Consider the video posted by Christopher Kohls, a content creator who goes by the name Mr. Reagan, titled *Kamala Harris Ad PARODY*, that was reposted on X by Elon Musk.[16]  The video uses AI to create an "advertisement" by Vice President Harris that has her saying things that she would never actually say.  While some would reasonably consider the video to be satire or parody — including because, in the video, "Harris" states that she is a "diversity hire," who "may not know the first thing about running the country" and is a "deep state puppet" — public statements made by Governor Newsom indicate that he believes that the statute would require the video to be removed from any covered platform.  *See* Ex. 13 (Gavin Newsom (@GavinNewsom), X (Sept. 17, 2024, 7:41 PM), https://x.com/GavinNewsom/status/1836188721663873324 (last visited Nov. 14, 2024)) (stating that Mr Reagan's *Kamala Harris Ad PARODY* video "should be illegal" and declaring, the same day that AB 2655 was passed, that he "just signed a bill to make this illegal in the state of California").  Under AB 2655, for covered platforms

---

[16] *See* Ex. 11 (Mr Reagan, *Kamala Harris Ad PARODY*, YouTube (July 26, 2024), https://www.youtube.com/watch?v=sVspeqNnoWM (last visited Nov. 14, 2024)); *see also* Ex. 12 (Elon Musk (@elonmusk), X (July 26, 2024, 7:11 PM), https://x.com/elonmusk/status/1816974609637417112 (last visited Nov. 14, 2024)).

to protect such speech, they will have to pay dearly by defending their content-moderation decisions in court.  And if they remove such content, they will have no costs at all.

69.  This combination of AB 2655's unintelligible requirements and draconian and one-sided Enforcement Provisions — which protect removal of content from any liability and impose enforcement costs only on decisions not to remove content — will lead to censorship at the direction of the State.  Liability regimes, set up by the State, that have a "tendency to inhibit constitutionally protected expression" cannot survive First Amendment scrutiny. *Smith* v. *California*, 361 U.S. 147, 155 (1959) (striking down, on First Amendment grounds, city ordinance providing for strict liability for possession of books later judged to be obscene).

70.  AB 2655's legislative history openly acknowledges the serious First Amendment problems raised by the statute's incentive structure and enforcement regime.  For instance:

71.  The Assembly Committee on Judiciary's April 22, 2024 analysis acknowledges that, "[c]onfronted with such a restricted timeline and the threat of a civil action . . . **platforms will 'remove significantly more content, including content that has accurate election information and content that is not materially deceptive.'**"  Ex. 4 at 12.

72.  The analysis also recognizes that "***with no sure means to determine what is 'materially deceptive,' the platforms will err on the side of blocking content, thus burdening more speech than is necessary***." *Id.* at 8.

73.  Jose Torres Casillas of TechNet, which opposed AB 2655, explained that AB 2655

> *[R]equires online platforms to make determinations about truth and falsity in an impossible way.* Instances where content or information is clearly true or clearly false are not [the] norm. Far more often, content falls into a middle ground where it requires time and a fact-intensive investigation to determine whether something is true or false. Investigative journalists have challenges with fact checking even the most high profile races or candidates. It is difficult enough for a platform to know whether something is false as it relates to a presidential candidate or a high profile federal race, and this is simply impossible for races lower down on the ticket. ***A platform cannot accurately adjudicate reports on those types of content and will instead resort to over removing information in order to avoid liability and the penalties in this bill. Removing information that is only suspected of being false is clearly not a good outcome***.

Ex. 5 at 5 (statements of Jose Torres Casillas, TechNet).[17]

74.  Khara Boender of the Computer Communications Industry Association (CCIA), which also opposed AB 2655, similarly explained that the content-moderation "tools that are currently available [to covered platforms] are not always reliable or accurate," and

> Because covered platforms are not privy to the intent and context for which a piece of content is used, they could ***inadvertently over block or over label content.***

---

[17] Available at https://digitaldemocracy.calmatters.org/hearings/257837?t=145&f=afb99536b82e1a34379ebbfd23fe84b1 (2:39–3:38) (last visited Nov. 14, 2024).

> ***This could result in user frustration and suppression of
> political speech.*** Political speech was at the core of
> why our First Amendment was established, and it is
> critical to maintain those protections. ***Responsibility
> for labeling AI generated election content and liability
> for the deceptive content should rest with the entity
> that puts forth such material***, the one that is most aware
> of the intent and context for which the content was
> created and shared. . . . And while the bill exempts
> satire and parody, it is unclear who gets to decide what
> constitutes those uses. ***Faced with individual users
> seeking injunctive relief merely if they disagree with a
> covered platform's decision regarding reported content,
> a service may choose to prohibit all digitally altered
> content, cutting off many valuable and helpful uses***.

*Id.* at 4–5 (statements of Khara Boender, CCIA).[18]

75.  Boender explained that AB 2655 will have an effect
similar to that of the takedown regime under the Digital Millennium
Copyright Act (DMCA), which, like AB 2655, provides immunity from
liability if material is taken down but potential liability if it
is not.  *See* 17 U.S.C. § 512(c)(1).  As Boender correctly pointed
out, AB 2655 will "***result in platforms being required to block
content almost constantly in order to ensure compliance***," which
has been the outcome under the DMCA, where platforms "err in taking
down the content lest they face[] liability."  Ex. 14 (*Defending
Democracy from Deepfake Deception Act of 2024: Hearing on AB 2655
Before the S. Standing Comm. on Elections and Constitutional
Amends.*, 2023–2024 Reg. Sess. (Cal. June 18, 2024)) at 5
(statements of Khara Boender, CCIA);[19] *see also* Ex. 15 (Wendy

---

[18] Available at
https://digitaldemocracy.calmatters.org/hearings/257837?t=27&f=afb99536b82e1a3
4379ebbfd23fe84b1 (0:49–2:09) (last visited Nov. 14, 2024).

[19] Available at

Seltzer, *Free Speech Unmoored in Copyright's Safe Harbor: Chilling Effects of the DMCA on the First Amendment*, 24 Harv. J.L. & Tech. 171 (2010)) (asserting that the DCMA encourages internet service providers to respond to copyright complaints by removing content to ensure immunity from liability, leading to the censorship of protected speech*)*.

76.   California Assembly Member Bill Essayli, who opposed the bill, recognized that ABB 2655's requirements are "a very sticky thing with the First Amendment and also with asking private companies to be the enforcer," and expressed that a better alternative is "***the Twitter model where they use the community to sort of regulate information on there. . . . where it's the public, it's the crowd sourcing, is kind of doing the moderating,***" rather than "***making an individual, company, or person the arbiter of what's disinformation.***"   Ex. 7 at 7-8 (statements of Bill Essayli, Assemb. Member).[20]

---

https://digitaldemocracy.calmatters.org/hearings/258097?t=87&f=213a711036e0125a7084c8b0dee7c131 (1:38-2:15) (last visited Nov. 14, 2024).

[20] Available                              at https://digitaldemocracy.calmatters.org/hearings/257736?t=2285&f=da025f00cb70d1ea6196340ca76df63e (38:10-38:51) (last visited Nov. 14, 2024).

**IV. AB 2655 Impermissibly Substitutes the Government's Judgment About Content Moderation for That of the Covered Platforms**

77.  X already has its own policy for regulating "synthetic" or "manipulated media" on its platform.  Under X's Synthetic and Manipulated Media Policy, users "may not share synthetic, manipulated, or out-of-context media that may deceive or confuse people and lead to harm ('misleading media')."  In addition, under the policy X "may label posts containing misleading media to help people understand their authenticity and to provide additional context."  Ex. 16 (*Synthetic and manipulated media policy*, X, https://help.x.com/en/rules-and-policies/manipulated-media (last visited Nov. 14, 2024)) at 3.

78.  Under X's policy — which is publicly available to all users of the platform as well as to the public generally — X uses the following criteria when considering removal and/or labeling of posts and media:

- 1. Is the content significantly and deceptively altered, manipulated, or fabricated?

- 2. Is the content shared in a deceptive manner or with false context?

- 3. Is the content likely to result in widespread confusion on public issues, impact public safety, or cause serious harm?

*See id.*

79.   In  addition,  X's  policy  also  makes  clear  that  the following  are  "generally  not  in  violation  of  this  policy":

- **Memes  or  satire**,  provided  these  do  not  cause significant  confusion  about  the  authenticity  of  the media.

- **Animations,  illustrations,  and  cartoons**,  provided these  do  not  cause  significant  confusion  about  the authenticity  of  the  media.

- **Commentary,  reviews,  opinion,  and/or  reactions**. Sharing  media  with  edits  that  only  add  commentary, reviews,  opinions,  or  reactions  allows  for  further debate  and  discourse  relating  to  various  issues  are not  in  violation  of  this  policy.

- **Counterspeech.**   We  allow  for  direct  responses  to misleading  information  which  seek  to  undermine  its impact  by  correcting  the  record,  amplifying  credible information,  and  educating  the  wider  community  about the  prevalence  and  dynamics  of  misleading  information.

*See id.* at 6.

80.   Other  covered  platforms  (e.g.,  Meta,  YouTube,  TikTok, and  Snapchat)  all  have  their  own  policies  designed  to  address false,  misleading,  and/or  manipulated  media.   *See* Ex. 17 (*How to identify  AI  content  on  Meta  products*,  Meta, https://www.meta.com/help/artificial-intelligence/how-ai-

generated-content-is-identified-and-labeled-on-meta/       (last visited Nov. 14, 2024)) at 2 ("Meta requires an AI label when content has photorealistic video or realistic-sounding audio that was digitally created, modified or altered, including with AI."); Ex. 18 (*Disclosing use of altered or synthetic content*, YouTube, https://support.google.com/youtube/answer/14328491 (last visited Nov. 14, 2024)) at 1 ("To help keep viewers informed about the content they're viewing, we require creators to disclose content that is meaningfully altered or synthetically generated when it seems realistic."); Ex. 19 (*About AI-generated content*, TikTok, https://support.tiktok.com/en/using-tiktok/creating-videos/ai-generated-content (last visited Nov. 14, 2024)) at 5 ("We also require creators to label all AI-generated content where it contains realistic images, audio, and video, as explained in our Community Guidelines."); Ex. 20 (*Generative AI on Snapchat*, Snapchat,                     https://help.snapchat.com/hc/en-us/articles/25494876770580-Generative-AI-on-Snapchat      (last visited Nov. 14, 2024)) at 1 ("We may indicate that a feature in Snapchat is powered by generative AI in a number of ways . . . When you see these contextual symbols or other indicators in Snapchat, you should know that you are . . . viewing content that has been produced using AI and does not depict real world scenarios.").

81. Each platform takes a different approach to these content-moderation decisions, as is the right of each platform

1  under the First Amendment.  *See Moody*, 144 S. Ct. at 2394, 2401,

2  2403, 2405, 2409.

3      82.  AB 2655 impermissibly substitutes the State's content-

4  moderation policies in this important area for those of the covered

5  platforms' and impermissibly imposes liability on the covered

6  platforms for noncompliance with the State's preferred content-

7  moderation policies.  This violates the First Amendment.

8      83.  X also currently has a program called "Community Notes"

9  that allow users to flag, among other things, content that they

10  believe needs context, is "materially deceptive" and otherwise

11  covered by the statute, or has been digitally altered.  Users are

12  free to provide additional context or information about the content

13  that will appear with the content if enough of the community's

14  "contributors," who otherwise hold diverse points of view, deem

15  the additional commentary to be helpful.  And, in recognition of

16  the fast-paced nature of social media, X has accelerated Community

17  Notes and now indicates "Lightning Notes," which start appearing

18  on posts within an hour of being proposed, or within an hour of

19  the post itself going live.

20      84.  The State has never explained why X's Synthetic and

21  Manipulated Media Policy, coupled with its "Community Notes"

22  program, are insufficient to address the "materially deceptive

23  content" targeted by AB 2655.  In fact, they work very well.

24

COMPLAINT                                    44

85. Nor has the State explained why the policies of other covered platforms, coupled with counterspeech from other users of the platforms, are insufficient to address the "materially deceptive content" targeted by AB 2655 in a less speech-restrictive manner.

**V.   AB 2839 & The *Kohls* Action**

86. On September 17, 2024, the same day Governor Newsom signed AB 2655 into law, he also signed into law AB 2839 (codified at Cal. Elec. Code § 20012), which institutes largely the same requirements as AB 2655 but frames them in terms of potential liability for content creators, rather than for platforms.

87. For instance, like AB 2655, AB 2839 prohibits "materially deceptive content" (defined nearly identically across the statutes) that is (i) a "candidate for any federal, state, or local elected office in California portrayed as doing or saying something that the candidate did not do or say if the content is reasonably likely to harm the reputation or electoral prospects of a candidate," § 20012(b)(1)(A)   (*compare   with*   §   20513(a)(2)(A));   (ii)   an "elections official portrayed as doing or saying something in connection with an election in California that the elections official did not do or say if the content is reasonably likely to falsely undermine confidence in the outcome of one or more election contests," § 20012(b)(1)(B)   (*compare with* § 20513(a)(2)(B));   or (iii) an "elected official portrayed as doing or saying something

in connection with an election in California that the elected official did not do or say if the content is reasonably likely to harm the reputation or electoral prospects of a candidate or is reasonably likely to falsely undermine confidence in the outcome of one or more election contests," § 20012(b)(1)(C) (*compare with* § 20513(a)(2)(C)).

88. As does AB 2655, AB 2839 institutes a *mens rea* requirement. *Compare* § 20012(b)(1) (limiting prohibitions to those that, "with malice, knowingly" violate § 20012(b)) *with* §§ 20513(a)(4), 20514(a)(3) (limiting Removal and Labeling Requirements to those that "know[] or act[] with reckless disregard").

89. On September 17, 2024, Christopher Kohls, an individual who creates digital content about political figures and who owns the screen name "Mr Reagan" on YouTube, *see supra* ¶ 68, moved for a preliminary injunction in the United States District Court for the Eastern District of California to enjoin the enforcement of AB 2839, because it violated (i) the First Amendment of the United States Constitution and Article I, Section 2, of the California Constitution (both facially and as-applied) and (ii) the Fourteenth Amendment of the United States Constitution for vagueness.

90. On October 2, 2024, the Honorable John A. Mendez granted the motion, finding that Kohls was likely to succeed in showing that AB 2839 facially violates the First Amendment and Article I,

Section 2, of the California Constitution, which is at least as protective, because AB 2839 is a content-based speech restriction that triggers and fails strict scrutiny. *Kohls*, 2024 WL 4374134, at *3-6.

91. In *Kohls*, the Court held that AB 2839 triggered constitutional review under strict scrutiny because it "specifically targets speech within political or electoral content pertaining to candidates, electoral officials, and other election communication, making it a content-based regulation that seeks to limit public discourse." *Id.* at *4.

92. The Court held that AB 2839 failed strict scrutiny because it was not the "least restrictive means available for advancing [its] interest," *id.* (quoting *NetChoice, LLC* v. *Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024)), since "[o]ther statutory causes of action such as privacy torts, copyright infringement, or defamation already provide recourse to public figures or private individuals whose reputations may be afflicted by artificially altered depictions peddled by satirists or opportunists on the internet," *id.* at *5.

93. The Court also rejected the arguments of defendants Robert Bonta and Shirley Weber that AB 2839 only restricts unprotected defamatory and/or false speech. *See id.* at *3-4. The Court explained that AB 2839 "does not use the word 'defamation' and by its own definition, extends beyond the legal standard for

defamation to include any false or materially deceptive content that is 'reasonably likely' to harm the 'reputation **or** electoral prospects of a candidate,'" *id.* at *3 (quoting § 20012(b)) (emphasis in original), and "does much more than punish potential defamatory statements" because it "does not require actual harm and sanctions any digitally manipulated content that is 'reasonably likely' to 'harm' the amorphous 'electoral prospects' of a candidate or elected official," *id.* (quoting §§ 20012(b)(1)(A), (C)).

94.   The Court further explained that AB 2839 did not restrict speech that was otherwise unprotected as "lies that involve 'some . . . legally cognizable harm'" under *United States* v. *Alvarez*, 567 U.S. 709 (2012), and that AB 2839 imposed "civil penalties for criticisms on the government" that "have no place in our system of governance." *Kohls*, 2024 WL 4374134, at *4.

95.   All of these arguments as to why AB 2839 fails to satisfy First Amendment scrutiny apply equally to AB 2655.

### FIRST CAUSE OF ACTION

**(Declaratory Relief and Preliminary and Permanent Injunctive Relief for Violations of the First Amendment of the United States Constitution (42 U.S.C. § 1983) and Article I, Section 2, of the California Constitution — Facial and As-Applied)**

96.   X Corp. realleges and incorporates herein by reference each and every allegation set forth above.

97.   AB 2655 violates the First Amendment of the United States Constitution and Article I, Section 2, of the California

1  Constitution by forcing covered platforms like X, under threat of
2  injunctive and other equitable enforcement, to remove and alter
3  certain constitutionally protected election-related content of
4  which the State of California disapproves, and to create a
5  reporting procedure to facilitate such removal and alteration.[21]

6      98.  First, AB 2655 imposes a prior restraint on speech, which
7  is the "most serious and the least tolerable infringement on First
8  Amendment rights," *Stuart*, 427 U.S. at 559, and does so as to
9  speech concerning "public issues and debate on the qualifications
10 of candidates," to which the "First Amendment affords the ***broadest***
11 ***protection***" to protect the "unfettered interchange of ideas for
12 the bringing about of political and social changes desired by the
13 people," *McIntyre*, 514 U.S. at 346.

14     99.  AB 2655 imposes a prior restraint on speech because
15 Sections 20515(b) and 20516 provide expedited causes of action
16 under Section 35 of the California Code of Civil Procedure through
17 which political speech will be enjoined before there occurs
18 a "final judicial determination" that the "speech is unprotected."
19 *Isaksen*, 2005 WL 8176605, at *3 (citing *Vance*, 445 U.S. 308)

20

21 [21] AB 2655 violates Article I, Section 2, of the California Constitution for all
   of the same reasons that it violates the First Amendment of the United States
   Constitution. *See, e.g.*, *Kohls*, 2024 WL 4374134, at *6 ("Under current case
22 law, the California state right to freedom of speech is at least as protective
   as its federal counterpart."); *City of Montebello* v. *Vasquez*, 1 Cal. 5th 409,
   421 n.11 (2016) ("[T]he California liberty of speech clause is broader and more
23 protective than the free speech clause of the First Amendment."); *Delano Farms
   Co.* v. *California Table Grape Com.*, 4 Cal. 5th 1204, 1221 (2018) ("[O]ur case
24 law interpreting California's free speech clause has given respectful
   consideration to First Amendment case law for its persuasive value.").

1   (denying motion for preliminary injunction as to already published

2   speech because it would have constituted a prior restraint).  Even

3   if a plaintiff demonstrates "through clear and convincing evidence"

4   that the speech meets the requirements of the statute, that showing

5   **does not** amount to proof that the speech is constitutionally

6   unprotected.  *See Kohls*, 2024 WL 4374134, at *3-4; *see also Garcia*,

7   786 F.3d at 747 (forcing Google through "takedown order" to remove

8   content previously published on YouTube before a final

9   determination that the content was unprotected amounted to a

10  "classic prior restraint on speech"); *Kelley*, 2023 WL 2347442, at

11  *9 (citing *Alexander*, 509 U.S. at 550; *Garcia*, 786 F.3d at 746-47)

12  (prior restraints "refer either to injunctions that restrict future

13  speech or require takedowns of currently-published speech");

14  *SolarPark Korea Co.*, 2023 WL 4983159, at *11 (same).  AB 2655

15  cannot overcome the "historical and heavy presumption against such

16  restraints."  *Garcia*, 786 F.3d at 747.

17       100. In addition, AB 2655 imposes a prior restraint on speech

18  because (i) nothing in AB 2655 prevents the enjoinment of speech

19  through a temporary restraining order or preliminary injunction

20  alternative to or in addition to suits under Sections 20515(b) and

21  20516; (ii) AB 2655 mandates the immediate removal of speech,

22  without a determination that it is unprotected, so long as it is

23  "substantially similar" to speech "previously removed" under the

24  statute, *see* § 20513(c); and (iii) the statute acts as an

overarching prior restraint by, in its pursuit of eliminating certain speech altogether, imposing a system of censorship that requires platforms to remove the speech within 72 hours absent a final ruling that it is unprotected.

101. Second, because AB 2655 imposes content-, viewpoint-, and speaker-based speech restrictions, it triggers constitutional review under strict scrutiny, which it cannot withstand.

102. Covered platforms "present[] a curated and 'edited compilation of [third party] speech,'" which "is itself protected speech." *Moody*, 144 S. Ct. at 2409 (quoting *Hurley*, 515 U.S. at 570); *see also id.* at 2401 ("A private party's collection of third-party content into a single speech product (the operators' 'repertoire' of programming) is itself expressive, and intrusion into that activity must be specially justified under the First Amendment."). Moreover, the First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley* v. *Maynard*, 430 U.S. 705, 714 (1977).

103. By forcing covered platforms to remove and modify particular speech that they may not otherwise remove or modify — i.e., certain election-related "materially deceptive content" — and to create a reporting requirement to facilitate such removal and modification, AB 2655 forces covered platforms to "'speak a particular message' that they would not otherwise speak, which constitutes compelled speech that dilutes their message." *Kohls*,

2024 WL 4374134, at *5 (citing *Nat'l Inst. of Fam. & Life Advocs.*
v. *Becerra ("NIFLA")*, 585 U.S. 755, 766 (2018); *X Corp.* v. *Bonta*,
116 F.4th 888, 900—02 (9th Cir. 2024)); *see also Washington Post*
v. *McManus*, 944 F.3d 506, 511-13, 519 (4th Cir. 2019) (striking
down state law that required, in an effort to address foreign
interference in U.S. elections, "online platforms," within "48
hours of an ad being purchased," to "display somewhere on their
site the identity of the purchaser, the individuals exercising
control over the purchaser, and the total amount paid for the ad,"
and declaring the law "a compendium of traditional First Amendment
infirmities" that would "chill speech"); *id.* at 515 ("each banner
feature of the Act — the fact that it is content-based, targets
political expression, and compels certain speech — poses a real
risk of either chilling speech or manipulating the marketplace of
ideas").  AB 2655 also impermissibly substitutes the judgment of
the government for that of covered platforms as to what constitutes
"materially deceptive content" covered by the statute and whether
it should remain on their platforms.

104. In addition, the underlying content that AB 2655 targets
— i.e., the content delineated in §§ 20513(a) and 20514(a) — is
itself constitutionally protected.  In other words, AB 2655 is not
merely a "restriction on knowing falsehoods that fall outside of
the category of false speech protected by the First Amendment as

1  articulated in" *Alvarez*, 567 U.S. 709.  *Kohls*, 2024 WL 4374134, at

2  *3.

3      105. Accordingly, AB 2655 is a content-based law — that is,

4  it "target[s] speech based on its communicative content," *Reed* v.

5  *Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) — and no exception

6  applies here to the longstanding rule that such regulations trigger

7  strict scrutiny.  *NIFLA*, 585 U.S. at 767 (quoting *Brown* v.

8  *Entertainment Merchants Assn.,* 564 U.S. 786, 792 (2011)) ("This

9  Court's precedents do not permit governments to impose content-

10 based restrictions on speech without persuasive evidence . . . of

11 a long (if heretofore unrecognized) tradition to that effect.").

12 By "specifically target[ing] speech within political or electoral

13 content pertaining to candidates, electoral officials, and other

14 election communication," AB 2655 "delineates acceptable and

15 unacceptable content based on its purported truth or falsity and

16 is an archetypal content-based regulation that our constitution

17 considers dubious and subject to strict scrutiny."  *Kohls*, 2024 WL

18 4374134, at *4.

19     106. AB 2655 triggers strict scrutiny for two additional

20 reasons.  First, AB 2655 discriminates based on the identity of

21 the speaker; it applies only to certain speakers (i.e., to covered

22 platforms such as X), while exempting others (e.g., certain

23 broadcasting stations, online newspapers, and magazines).  *See,*

24 *e.g.*, *Sorrell* v. *IMS Health Inc.*, 564 U.S. 552, 571 (2011) (laws

that interfere with the speech rights of only certain speakers "justify application of heightened scrutiny" particularly when they are aimed at specific content); *see also Moody*, 144 S. Ct. at 2405 (quoting *Tornillo*, 418 U.S. at 258) ("'The choice of material,' the 'decisions made [as to] content,' the 'treatment of public issues' — 'whether fair or unfair' — all these 'constitute the exercise of editorial control and judgment.' . . . **For a paper, and for a platform too**."). Second, AB 2655 discriminates based on viewpoint, because it permits election-related content that is "'positive' about a person," while restricting such content if it is "derogatory." *Iancu* v. *Brunetti*, 588 U.S. 388, 393 (2019) (quoting *Matal* v. *Tam*, 582 U.S. 218, 249 (2017) (Kennedy, J., concurring)) (explaining that such differential treatment "reflects the Government's disapproval of a subset of messages it finds offensive" and "is the essence of viewpoint discrimination").

107. AB 2655 may stand, then, only if the government proves that the statute is "narrowly tailored to serve compelling state interests," *NIFLA*, 585 U.S. at 766 (quoting *Reed*, 576 U.S. at 163), and no "less restrictive alternative would serve the [g]overnment's purpose," *X Corp.*, 116 F.4th at 903 (quoting *United States* v. *Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000)).

108. AB 2655 fails strict scrutiny because, even if California has a compelling interest in protecting free and fair elections, AB 2655 is not the "least restrictive means available for advancing

1    [that] interest," *Kohls*, 2024 WL 4374134, at *4 (quoting *NetChoice,*

2    *LLC*, 113 F.4th at 1121), and the "First Amendment does not 'permit

3    speech-restrictive measures when the state may remedy the problem

4    by implementing or enforcing laws that do not infringe on speech,'"

5    *id.* (quoting *IMDb.com, Inc.* v. *Becerra*, 962 F.3d 1111, 1125 (9th

6    Cir. 2020)); *see also Ex parte Stafford*, 2024 WL 4031614, at *4-6

7    (Tex. Crim. App. Sept. 4, 2024) (applying strict scrutiny and

8    striking down on First Amendment grounds Texas statute prohibiting

9    "knowingly represent[ing] in a campaign communication that the

10   communication emanates from a source other than its true source"

11   because there were "narrower means of achieving the State

12   interests," including enforcing an existing statute).  Moreover,

13   it is not a "valid, let alone substantial" interest for a state to

14   seek "to correct the mix of speech" that "social-media platforms

15   present." *Moody*, 144 S. Ct. at 2407; *see also id.* at 2409 (quoting

16   *Pac. Gas & Elec. Co.*, 475 U.S. at 20) ("[A] State 'cannot advance

17   some points of view by burdening the expression of others.'").[22]

18        109. AB 2655 is facially invalid under the First Amendment

19   because "a substantial number of [the law's] applications are

20   unconstitutional, judged in relation to the statute's plainly

21   legitimate sweep." *Americans for Prosperity Foundation* v. *Bonta*,

22   594 U.S. 595, 615 (2021).  It is also unconstitutional as-applied

23   to X Corp. specifically.

24

[22] Nor would AB 2655 survive under any lesser standard of review.

110. There is a *bona fide* and actual controversy between X Corp. and Defendants because Defendants are charged with enforcing, and intend to enforce, AB 2655, even though it violates the First Amendment of the United States Constitution and Article I, Section 2, of the California Constitution, both facially and as-applied to X Corp.

111. X Corp. maintains that AB 2655 is illegal and unconstitutional. Defendants claim otherwise.

112. X Corp. requests a judicial determination regarding the validity of AB 2655 to prevent the harm caused by its enactment. Such a determination is both necessary and appropriate to avoid the deprivation of X's and the other covered platforms' constitutional rights, which would occur if AB 2655 is applied to X Corp. or any other covered platform.

113. Given the violation of the First Amendment of the United States Constitution and Article I, Section 2, of the California Constitution, X Corp. seeks preliminary and permanent injunctive relief against enforcement of AB 2655. X and the other covered platforms would be irreparably harmed if they were forced to comply with AB 2655's requirements and have no adequate remedy at law.

1

**SECOND CAUSE OF ACTION**

2

**(Declaratory Relief and Preliminary and Permanent Injunctive Relief for Immunity Under and Preemption by 47 U.S.C. §§ 230(c)(1) and 230(c)(2))**

3

4

114. X Corp. realleges and incorporates herein by reference each and every allegation set forth above.

5

6

115. 47 U.S.C. §§ 230(c)(1) and 230(c)(2) each directly conflict with, and thus preempt, AB 2655.

7

8

116. 47 U.S.C. § 230(e)(3) provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."

9

10

11

117. AB 2655 imposes liability on covered platforms by holding them responsible for the content of what is on their platforms, as if they were the publisher of that content. It requires removal and labeling of content that the State disfavors (i.e., "materially deceptive content" that is otherwise covered by the statute) and requires removal and labeling of such content if the covered platforms fail to comply. *See* §§ 20513–201516.

12

13

14

15

16

17

18

118. "Liability" under Section 230(e)(3) includes being subjected to the kind of injunctive and other equitable relief authorized by AB 2655's Enforcement Provisions. *See, e.g.*, *Hassell v. Bird*, 5 Cal. 5th 522, 544-45 (2018) (finding that Section 230 barred "cause[s] of action" directing Yelp to remove defamatory consumer reviews).

19

20

21

22

23

24

119. X is an "interactive computer service," as that term is defined under 47 U.S.C. § 230(f)(2).

**_Section 230(c)(1)_**

120. AB 2655 directly contravenes the immunity provided to the covered platforms by 47 U.S.C. § 230(c)(1), which prohibits treating interactive computer service providers as the "publisher or speaker of any information provided by another information content provider."

121. AB 2655's Enforcement Provisions violate Section 230(c)(1) because they provide causes of action for "injunctive or other equitable relief against" the covered platform to remove or (by adding a disclaimer) alter certain content posted on the platform by its users. _See_ §§ 20515(b), 20516.  AB 2655 thus treats covered platforms "as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).

122. Section 230(c)(1) bars such liability where the alleged duty violated derives from an entity's conduct as a "publisher," including "reviewing, editing, and deciding whether to publish or withdraw from publication third-party content." _See, e.g._, _Barnes_ v. _Yahoo!, Inc._, 570 F.3d 1096, 1102 (9th Cir. 2009) (finding that Yahoo! was entitled to immunity under Section 230(c)(1) from claims concerning failure to remove offending profile), _as amended_ (Sept. 28, 2009); _Calise_ v. _Meta Platforms, Inc._, 103 F.4th 732, 744 (9th Cir. 2024) (finding that Meta was immune under Section 230(c)(1)

1  from claims that would require Meta to "actively vet and evaluate

2  third-party ads" in order to remove them).

3  ***Section 230(c)(2)(B)***

4      123. AB 2655 also directly contravene the immunity provided

5  to the covered platforms by 47 U.S.C. § 230(c)(2)(B), which

6  prohibits holding interactive computer service providers "liable

7  on account of . . . any action taken to enable or make available

8  to information content providers or others the technical means to

9  restrict access to [objectionable] material."

10     124. Section 20516 of AB 2655's Enforcement Provisions

11  violates Section 230(c)(2)(B) because it provides causes of action

12  for "injunctive or other equitable relief against" covered

13  platforms that attempt to comply with the Reporting Requirement,

14  but do so in a manner that, in the government attorney's view, does

15  not meet the reporting "require[ments]" of "subdivision (a) of

16  Section 20515." § 20516.

17     125. A covered platform's attempt to comply with the Reporting

18  Requirement (i.e., creating a reporting mechanism for users to

19  report content covered by the statute) is an action to make

20  available the technical means to restrict access to objectionable

21  content, as contemplated by Section 230(c)(2)(B), and covered

22  platforms will face enforcement if they do not comply to the

23  satisfaction of the California government.

24

126. There is a *bona fide* and actual controversy between X Corp. and Defendants because Defendants are charged with enforcing, and intend to enforce, AB 2655, even though such enforcement is precluded and preempted by 47 U.S.C. §§ 230(c)(1) and 230(c)(2).

127. X Corp. maintains that AB 2655 is invalid and void as a matter of law.  Defendants claim otherwise.

128. X Corp. seeks a declaratory judgment that AB 2655 is legally invalid and unenforceable because it is precluded and preempted by 47 U.S.C. §§ 230(c)(1) and 230(c)(2).

129. Given the violation of 47 U.S.C. §§ 230(c)(1) and 230(c)(2), X Corp. seeks preliminary and permanent injunctive relief against enforcement of AB 2655.  X Corp. would be irreparably harmed if it were forced to comply with, or litigate, AB 2655's requirements and has no adequate remedy at law.

## THIRD CAUSE OF ACTION

**(Declaratory Relief and Preliminary and Permanent Injunctive Relief for Violations of the First and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983) for Vagueness)**

130. X Corp. realleges and incorporates herein by reference each and every allegation set forth above.

131. AB 2655 is void for vagueness under the First and Fourteenth Amendments of the U.S. Constitution because the statute's requirements and prohibitions are so unintelligible that X and the other covered platforms cannot understand what the law prohibits.

132. X and the other covered platforms cannot understand what would constitute a "[d]eepfake" under Section 20512(d) because they cannot understand what "would falsely appear to a reasonable person to be an authentic record of the actual speech or conduct of the individual depicted in the media."

133. X and the other covered platforms cannot understand what would constitute "[m]aterially deceptive content" under Section 20512(i) because they cannot understand what "would falsely appear to a reasonable person to be an authentic record of the content depicted in the media."

134. X and the other covered platforms cannot understand what would constitute "state-of-the-art techniques" under Sections 20513(a), 20513(c), and 20514(a).

135. X and the other covered platforms cannot understand what would be "reasonably likely to harm the reputation or electoral prospects of a candidate" under Section 20513(a)(2)(A).

136. X and the other covered platforms cannot understand what would be "reasonably likely to falsely undermine confidence in the outcome of one or more election contests" under Sections 20513(a)(2)(B) and 20513(a)(2)(C).

137. X and the other covered platforms cannot understand what would "influence[] an election in California" under Section 20513(a)(2)(C).

COMPLAINT                                     61

138. X and the other covered platforms cannot understand what would constitute a candidate for elective office, an elections official, or an elected official being "portrayed as doing or saying something" that they "did not do or say" under Sections 20513(a)(2)(A), 20513(a)(2)(B), and 20513(a)(2)(C).

139. X and the other covered platforms cannot understand what would constitute an "easy-to-understand format" under Section 20514(d).

140. Due to the vagueness and ambiguity of these terms and phrases, AB 2655 fails to give X and the other covered platforms "a reasonable opportunity to know what" the statute "prohibit[s]." *Hunt* v. *City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011).

141. AB 2655 "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.*; *see also, e.g.*, *NAACP* v. *Button*, 371 U.S. 415, 432 (1963) (holding that the "standards of permissible statutory vagueness are strict in the area of free expression").

142. There is a *bona fide* and actual controversy between X Corp. and Defendants because Defendants are charged with enforcing, and intend to enforce, AB 2655, even though it violates the First and Fourteenth Amendments of the United States Constitution for vagueness.

143. X Corp. maintains that AB 2655 is illegal and unconstitutional. Defendants claim otherwise.

144. X Corp. requests a judicial determination regarding the validity of AB 2655 to prevent the harm caused by its enactment. Such a determination is both necessary and appropriate to avoid the deprivation of X's and the other covered platforms' constitutional rights, which would occur if AB 2655 is applied to X or any other covered platform.

145. Given the violation of the First and Fourteenth Amendments of the United States for vagueness, X Corp. seeks preliminary and permanent injunctive relief against enforcement of AB 2655. X and the other covered platforms would be irreparably harmed if they were forced to comply with AB 2655's requirements and have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, X Corp. respectfully requests that this Court enter judgment in X Corp.'s favor and grant the following relief:

1.  A declaration that AB 2655 violates the First Amendment of the United States Constitution and Article I, Section 2, of the California Constitution, both facially and as-applied to X Corp.;

2.  A declaration that the injunctive and other equitable relief provided by AB 2655 is precluded and preempted by 47 U.S.C. §§ 230(c)(1) and 230(c)(2) and is therefore null and void and has no legal effect;

3.    A   declaration   that   AB   2655   violates   the   First   and Fourteenth   Amendments   of   the   United   States   Constitution   for vagueness;

4.    A   preliminary   and   permanent   injunction   enjoining Defendants and their employees, agents, and successors in office from enforcing AB 2655;

5.    An   award   of   fees,   costs,   expenses,   and   disbursements, including attorneys' fees, to which X Corp. is entitled pursuant to 42 U.S.C. § 1988 and other applicable law; and

6.    Such   other   and   further   relief   as   the   Court   deems   just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Pursuant   to   Federal   Rule   of   Civil   Procedure   38,   X   Corp. demands a trial by jury in this action of all issues so triable.

Dated: November 14, 2024

By: /s/ William R. Warne
DOWNEY BRAND LLP
William R. Warne (SBN 141280)
Meghan M. Baker (SBN 243765)
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Phone: 916-444-1000
Facsimile: 916-520-5910

CAHILL GORDON & REINDEL LLP
Joel Kurtzberg (*pro hac vice pending*, SBN NY 1758184)
Floyd Abrams (*pro hac vice pending*, SBN NY 2835007)
Jason Rozbruch (*pro hac vice pending*, SBN NY 5753637)
32 Old Slip
New York, NY 10005
Phone: 212-701-3120
Facsimile: 212-269-5420
jkurtzberg@cahill.com